UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MILES H. MALOZIEC,

      Plaintiff,                         Civil Action No. 17-10419

v.                                  HON. DAVID M. LAWSON
                                     U.S. District Judge
                                     HON. R.  STEVEN WHALEN

COMMISSIONER OF SOCIAL          U.S. Magistrate Judge
SECURITY,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Miles H. Maloziec ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner ("Defendant") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Docket #14] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #11] be DENIED.

## I.  PROCEDURAL HISTORY

On June 22, 2012 , Plaintiff filed applications for DIB and SSI, alleging an onset of disability date of January 1, 1998 (Tr. 297, 303).  After the initial denial of the claim,

-1-

Plaintiff requested an administrative hearing, held on January 13, 2014 in Livonia, Michigan (Tr. 70). Administrative Law Judge ("ALJ") B. Lloyd Blair presided. On February 24, 2014, ALJ Blair found that Plaintiff was not disabled (Tr. 139-151). On June 10, 2015, the Appeals Council remanded the case for further fact-finding and an additional hearing on the basis that (1) the RFC did not reflect Plaintiff's social limitations as found by a consultative source, and, (2) the ALJ's reported reasons for rejecting psychiatrist Fred Stelson, M.D.'s opinion did not address Dr. Stelson's earlier treating records (Tr. 159).

ALJ Blair held a second hearing on August 28, 2015 (Tr. 35). Plaintiff, represented by Michael J. Cantor, testified, (Tr. 37-53), as did Medical Expert ("ME") Dr. Stelson (54-64), and Vocational Expert ("VE") Kelly Stroker (Tr. 65-68). On November 19, 2015, ALJ Blair again determined that Plaintiff was not disabled (Tr. 14-28). On December 9, 2016, the Appeals Council denied review of the claim (Tr. 1-4). Plaintiff filed for judicial review of the final decision on February 9, 2017.

## II. BACKGROUND FACTS

Plaintiff, born June 19, 1987, was 28 when the ALJ issued his more recent decision (Tr. 28, 303). He completed 12th grade in 2009 (Tr. 364). His application for benefits alleges disability as a result of bipolar disorder, anxiety, severe depression, hypertension, panic disorder, chronic pain syndrome, a fractured right ankle, tendinitis, obsessive compulsive disorder ("OCD"), panic attacks, hip pain due to a previous injury, non-epileptic seizures, ticks, and a history of one epileptic seizure (Tr. 363).

### A.  Plaintiff's Testimony (August 28, 2015 hearing)

 Plaintiff offered the following testimony:

 He possessed a valid driver's license but did not drive (Tr. 38).  He continued to treat with a psychiatrist and "addiction medicine doctor" (Tr. 39).  He was unable to work because he did not "know what type of mood or who [he was] going to be from 45 minutes to the next . . . ." (Tr. 39).  He experienced depression characterized by anhedonia, mood swings, anger, fearfulness, and lack of a social life (Tr. 40).  He seldom left his mother's apartment unless he was in a "manic" state (Tr. 40).  He experienced lack of focus (Tr. 40).  The night before the hearing, it took him two hours to watch "Wheel of Fortune" due to his inability to concentrate enough to sit, watch the program, and get through the commercials (Tr. 41).  He generally lacked the ability to start and finish household projects without becoming distracted by another activity (Tr. 41).  His OCD was characterized by washing his hands  25 times a day (Tr. 41-42).  During his "manic" phases, he "snapped" and would behave rudely to his mother (Tr. 42).  He feared for the future, noting that his financially limited mother had to come up with $55.22 every few days for Suboxone, a medication that both helped him maintain sobriety and improved his mental state (Tr. 44).

 During his depressive phases, he would sit against his bed and stare into the distance and sometimes become nauseous due to anxiety (Tr. 45).  He experienced such moods one out of every three days (Tr. 47).  Aside from anxiety-induced symptoms of stomach upset, he denied disabling physical problems (Tr. 49).  He had not used drugs for at least five years

and had not used alcohol in more than a year (Tr. 52).

**B.  Testimony by Treating Physician Psychiatrist Fred Stelson, M.D.**

Dr. Stelson offered the following testimony:

He had been treating Plaintiff for three years (Tr. 55).  He diagnosed Plaintiff with a mood disorder (bipolar); panic disorder; and OCD (Tr. 55).  The mood disorder was characterized by low energy and motivation (Tr. 55).  The symptoms of mood disorder had been improved over the course of treatment (Tr. 55).  Plaintiff's inability to be happy was related in part to his years of drug addiction (Tr. 56).  The panic disorder was characterized by shortness of breath, sweating, shaking, and feelings of panic (Tr. 56).  The OCD was manifested by Plaintiff's compulsion to wash his hands often (Tr. 56).

Dr. Stelson opined that Plaintiff could "concentrate for a while" and could perform tasks that were "not too complex for a period of time" (Tr. 57).  He stated that Plaintiff would experience difficulty working "consistently and reliably" within a schedule but might be capable of "piece work off a schedule" (Tr. 57).  Dr. Stelson found that Plaintiff would have trouble "getting out of his bed, much less out of the house" around twice a month (Tr. 58).  He allowed for the possibility that Plaintiff exaggerated his symptoms but noted "plenty of evidence" of "serious problems" (Tr. 58).  He noted an improvement but stated that Plaintiff "still couldn't function reliably enough to be in a regular job" due to the three psychiatric disorders (Tr. 60).

### C.    Medical Evidence

### 1.    Treating Sources[1]

In July, 2010, Plaintiff was hospitalized for two days after experiencing seizures attributable to alcohol withdrawal (Tr. 486).  October, 2011 orthopedic records state that Plaintiff currently took Suboxone, Xanax, and Elavil (Tr. 474).  Plaintiff exhibited normal grooming and denied current drug use (Tr. 474).  He did not exhibit mood disorders and was "alert and oriented" (Tr. 474).

February, 2012 psychiatric records by Dr. Stelson state that Plaintiff became addicted to opiates/heroin and alcohol after taking pain pills for an ankle problem (Tr. 572).  Plaintiff reported "some benefit" from  Xanax and Amitriptyline prescribed by treating source Peter Schoeps, D.O. (Tr. 572).  He reported the stressors of chronic family conflict (Tr. 572).  He appeared full oriented with good grooming and normal speech with a "fair" ability to focus (Tr. 572-573).  He was diagnosed with depression, social phobia, OCD, and panic disorder (Tr. 572).  Dr. Stelson described Plaintiff as a 24-year-old "disabled by depression and anxiety" (Tr. 573).

A March, 2012 MRI of the right ankle showed only mild tenosynovitis (Tr. 480-481, 562-563).  Dr. Stelson's records from the same month  note "some improvement in mood"

---

[1]

Plaintiff does not claim any error regarding the allegations of physical limitation. *Plaintiff's Brief, 7, Docket #11,* Pg ID 930.  The records pertaining to his physical condition, while reviewed, are not discussed here except to the extent that they contain evidence related to the alleged mental limitations.   The records predating the application date of June 22, 2012 are included for background purposes only.

from Zoloft (Tr. 575). Dr. Stelson's records from the following month note a significant improvement (Tr. 576-577). June, 2012 records by Dr. Schoeps note the conditions of anxiety, depression, OCD, bipolar, chronic pain syndrome, and hypertension (Tr. 568). The following month, Plaintiff reported that he reversed his sleep cycle to avoid interacting with his mother (Tr. 578, 867). He exhibited increased energy and discussed "the possibility of preparing for college-level work" (Tr. 578). In June, 2012, he denied recent panic attacks (Tr. 580).

Therapist Patrick Reid's July, 2012 notes state that Plaintiff expected to be turned down the first time applying for SSI but was also making plans to register at Schoolcraft College once he received student loan approval (Tr. 589). Plaintiff reported that he would "eventually live with his father and inherit his home" (Tr. 589). He stated that he fought "constantly" with his mother (Tr. 589). He complained that his father would not let him use a car that was given to him as a graduation gift (Tr. 592). Reid characterized Plaintiff's situation as "intolerable" (Tr. 592). Reid noted good motivation (Tr. 592). Reid proposed improving the condition of OCD through behavior modification (Tr. 594). The same month, Plaintiff reported reduced symptoms of OCD (Tr. 596). Reid noted as follows:

> Miles is waiting to hear about his SSI, but it is not clear how he is disabled. He does want the money to get back on his feet but he should be more aggressive in finding a job. There are several potential employers within walking distance of his apartment, but he has done very little to get a job. He has very little drive to achieve his independence (Tr. 596).

Reid added that "[f]inding a job has to become a bigger part of Mile's therapy. He is too passive about this" (Tr. 597). The next month, Reid noted that Plaintiff's father's ability to help his son was compromised by bankruptcy (Tr. 598). Reid found that Plaintiff spent "too much time and energy blaming his parents" and would be "a good candidate for [] trade school" (Tr. 598). The same month, Reid noted that Plaintiff's mother's attendance at one session "illustrated how negative and self-indulgent [Plaintiff] is" (Tr. 600). At the following session, Plaintiff expressed an interest in trade school, but later failed to perform followup research (Tr. 602, 604). The same month, Dr. Schoeps noted that Plaintiff was planning on attending trade school but was "not able to function and hold [a] job due to limited structure and OCD restrictions (Tr. 737).

In September, 2012, Dr. Stelson noted that Plaintiff was still depressed but "much better" than a few months earlier (Tr. 608, 857). Records by Reid from the same month note Plaintiff's claim that none of his medication was working and need for a medical marijuana license (Tr. 611). The following month, Plaintiff reported that he was going to visit his sister but probably would not be allowed to hold his eight-month-old niece (Tr. 614). Dr. Stelson noted that Plaintiff's panic attacks were "mostly better" (Tr. 859). Reid's notes from the following month state that Plaintiff was again preoccupied by who was going to pay for his medication after he turned 26 in the next year (Tr. 646). He stated that he enjoyed playing with his niece (Tr. 646). Plaintiff reported feeling guilty that his sister had been diagnosed with thyroid cancer while he had remained healthy since quitting drugs (Tr. 648). Reid's

December, 2012 records state that Plaintiff's allegations of "complete anhedonia" were "not well founded" given his report that he enjoyed himself at a family function (Tr. 656). Plaintiff reported that he would "get food stamps" and "look for a job" that paid "under the table" and possibly go to school while waiting for his SSI to be approved (Tr. 658). Reid noted that both he and Dr. Stelson advised Plaintiff to get a job but that Plaintiff had "done nothing" (Tr. 661). The same month, Dr. Schoeps noted that Plaintiff was "not doing well," proposing to "get him set up with another opinion . . . ." (Tr. 726).

In January, 2013, Reid characterized Plaintiff as "self-indulgent and lazy" (Tr. 668). The following month, Plaintiff reported that he was socializing with someone from his "drug days" (Tr. 676). The same month, he reported that he was interacting with a childhood friend and the friend's girlfriend (Tr. 862). In March, 2013, Reid opined that Plaintiff's parents were "stunting his development" (Tr. 680). Plaintiff reported that he enjoyed going out to eat, playing video games, and watching television (Tr. 684). The following month, Plaintiff reported that he was going to his sister's birthday party (Tr. 691). The same month, imaging studies of the abdomen showed gallstones (Tr. 742).

In June, 2013, Dr. Stelson completed a form for the State of Michigan noting the conditions of anxiety, OCD panic disorder, depression, bipolar, heroin dependance, and polysubstance abuse (Tr. 630). He found that Plaintiff experienced marked limitations in the ability to compete a normal workday without interruptions from psychologically based symptoms (Tr. 634). He noted that while Plaintiff was able to manage anxiety attacks outside

the home, he nonetheless experienced "disabling" anxiety attacks (Tr. 634).  Medication review records from the same month note Dr. Stelson's report of hyperactive motor activity but low self esteem (Tr. 706).  Stelson's October, 2013 records state that Plaintiff experienced some breakthrough anxiety but was mostly doing well with a "fairly positive" mood (Tr. 825).

In January, 2014 Dr. Schoeps composed a letter on behalf of Plaintiff's disability claim, stating that Plaintiff experienced severe depression, anxiety, and "debilitating panic attacks" (Tr. 826).  Dr. Schoeps noted that Plaintiff continued to lose weight and was unable to function independently and observed that Plaintiff's parents still brought him to appointments (Tr. 826).  The same month, Dr. Stelson found at most moderate work-related psychological limitation but noted that the evaluation reflected Plaintiff's "treated state" which was "greatly improved" in comparison to his pretreatment condition (Tr. 829).  In March, 2014, Dr. Stelson noted that Plaintiff was "six years clean" but felt depressed and angry (Tr. 872).

In January, 2015, Dr. Stelson noted that Plaintiff typically woke up "sweating" and had to change shirts several times a day (Tr. 881).  His condition was deemed otherwise "okay" (Tr. 881).  He reported better sleeping habits (Tr. 882).  Dr. Stelson's April, 2015 records note "bad" depression but state that in May, 2015 that he was doing "okay" and in June, 2015, "alright" (Tr. 885-887).  In July, 2015, Dr. Stelson composed a letter on behalf of Plaintiff's disability claim,  opining that Plaintiff was unable to "perform consistently and

in a timely manner" and for a period each day was "totally disabled by his anxiety symptoms" (Tr. 853). He found that Plaintiff's ability to complete a shift would be precluded by his need to wash his hands repeatedly (Tr. 853). He found that Plaintiff's work abilities were further compromised by a possible "relapse into . . . substance abuse" and inappropriate behavior (Tr. 854). A medication review from the same month states that Plaintiff was "nervous" about his upcoming hearing on the SSI claim (Tr. 889).

## 2. Other Sources

In November, 2012 internist Mary C. Wood, M.D. performed a physical examination on behalf of the SSA, noting that Plaintiff overdosed multiple times between the age of 17 and 22 and had undergone inpatient substance abuse treatment (Tr. 618). Plaintiff reported that he last worked two years ago at a speedway gas station (Tr. 618). Dr. Wood recommended a psychiatric evaluation (Tr. 621).

The same month, Rose Moten, Ph.D. performed a non-examining review of the treating psychiatric/psychological records on behalf of the SSA, finding that as a result of affective and anxiety-related disorders, Plaintiff experienced mild restriction in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 129, 133).

In June, 2015, Leonidas Rojas, M.D. performed a consultative assessment of Plaintiff's physical condition on behalf of the SSA, noting Plaintiff's report that he heard voices "telling him to harm himself," and had suicidal ideation (Tr. 833). The physical

-10-

examination was unremarkable (Tr. 835-838).  He found no physical limitations in activities of daily living (Tr. 844).

The same month, Suzanne M. Kenna, M.A., working under Terannce A. Mills, Ph.D. performed a consultative psychological evaluation on behalf of the SSA, noting Plaintiff's report of bipolar disorder, depression, and the inability to control his emotions (Tr. 846).  He denied leaving his mother's apartment in five years except for doctors appointments (Tr. 846).  He reported playing video games and constantly washing his hands (Tr. 847).  He denied hallucinations (Tr. 847).

Kenna observed normal motor activity (Tr. 847).  Plaintiff appeared fully oriented but appeared "to have bipolar disorder because of mood swings" (Tr. 848).  Kenna found that Plaintiff could "remember and understand simple instructions and respond to appropriate supervision, co-worker interaction, and normal work routines, pressures and settings" (Tr. 848).  She found marked limitation in the ability to make judgments regarding complex work-related decisions, interacting appropriately with the public and coworkers, and responding appropriately to work situations (Tr. 850-851).

### D.  Vocational Expert

VE classified Plaintiff's former work as a cashier and stocker/laborer as unskilled and exertionally light and work as a prep cook, unskilled/medium[2] (Tr. 465).  The ALJ then

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or

posed the following question to the VE, describing a hypothetical individual of Plaintiff's

age, education, and work background:

> Assume the individual is restricted to simple, unskilled work involving one, two or three-step instructions; no jobs involving concentration with detailed or precision tasks, multitasking, reading, computing, calculating or problem solving; should have jobs that do[] not require teamwork or working in close proximity of co-workers; jobs with minimal contact from a supervisor and no contact with the public; work at a flexible pace without production quotas not in any [] specific number of pieces or having to be downline or [] co-worker dependent upon the individual's productivity. In your opinion would there be significant number of jobs in existence in the region and national economy such a person could perform? (Tr. 66).

The VE responded that the above-stated limitations would allow the hypothetical individual

to perform the light, unskilled work of an assembler (1,500 jobs in Southeast Michigan);

inspector (1,000); and packager (1,500) (Tr. 66). She found that the need to miss work two

days a month would be work preclusive (Tr. 67). The VE stated that her testimony was

consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*"),

noting that the testimony regarding absences was based on her own professional experience

(Tr. 67). In response to questioning by Plaintiff's counsel, the VE testified that the

individual's need to take unscheduled breaks "frequently" to wash his hands would also be

work preclusive (Tr. 67).

---

carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

### E.      The ALJ's Decision

Citing the medical transcript, ALJ Blair found that although Plaintiff experienced the severe impairments of a "history of heroin abuse, alcohol abuse, [OCD], depression, and panic disorder," none of the conditions met or medically equaled one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4 (Tr. 16-17).  The ALJ found that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and in concentration, persistence, or pace (Tr. 17).   The ALJ determined that Plaintiff retained the  residual functional capacity ("RFC") for work at all exertional levels with the following additional limitations:

> [C]laimant is limited to simple, unskilled work with one to three-step instructions.  The claimant's work cannot require concentration on detailed/precision tasks, multitasking, reading, computing/calculating, or problem solving.  The claimant's job cannot require teamwork, or working in close physical proximity to coworkers.  The claimant should have minimal contact with supervisors, and no contact with the public.  The claimant must be able to work at a flexible pace without quotas mandating a specific number of pieces per hour, or with [] up line or down line coworkers dependent on the the claimant's productivity (Tr. 18).

He found that Plaintiff's previous job activity did not amount to past relevant work (Tr. 27). Adopting the VE's job findings, he found that Plaintiff could work as an assembler, inspector, and packager (Tr. 28, 66).

The ALJ found that the allegations of disabling limitation stood at odds with significant portions of the treating and consultative records (Tr. 19).  He noted that neither the treating records nor objective studies supported Plaintiff's allegations of physical

limitation (Tr. 21).  The ALJ cited Dr. Stelson's treating records showing that Plaintiff

contemplated getting a job while awaiting a decision on his disability application (Tr. 22).

The ALJ noted that Plaintiff's mood improved in 2012 after a medication adjustment (Tr.

22).  The ALJ cited therapy records showing that Plaintiff complained about his father's

failure to repair Plaintiff's car and had a desire to get a job and go back to school (Tr. 22).

He cited Reid's therapy records stating that Plaintiff enjoyed attending a family event and

was planning on applying for a bridge card and working "'under the table'" until receiving

an award of disability (Tr. 23).  The ALJ noted that Plaintiff's "past drug and alcohol use"

likely "contributed to his sparse employment history" (Tr. 27).

### III. STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine

whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of*

*Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more

than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S.

389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,*

305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and

"presupposes that there is a 'zone of choice' within which decision makers can go either way,

without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir.

1986)(en banc).  In determining whether the evidence is substantial, the court must "take into

account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.  ANALYSIS

Plaintiff makes several contentions in support of remand.  *Plaintiff's Brief* at 4, *Docket #11,* Pg ID 927.  First, he argues that substantial evidence does not support the credibility determination or the conclusions regarding Dr. Stelson's treating findings or Kenna's consultative findings.  *Id.*  Second, he alleges that the administrative opinion contains "major discrepancies and misstatements of fact and law."  *Id.*   In his third argument, Plaintiff argues, in effect, that the ALJ failed to consider the possibility of disability for a "closed period" sometime between the June, 2012 application date and the November, 2015 determination.  *Id.*  Fourth, he faults the ALJ for according significant weight to November, 2012 non-examining findings over the newer treating and consultative records.  *Id.*  In his fifth and final argument, he contends that the finding that he was not disabled at the time of the second hearing is not supported by substantial evidence.  *Id.*

Plaintiff's argument that the credibility determination and discussion of the medical evidence (Argument 1); contention that the ALJ misstated the facts and applicable law (Argument 2); and generalized argument that substantial evidence does not support the non-disability determination (Argument 5) will be considered in tandem.  Plaintiff's argument that the ALJ failed to consider disability for a closed period (Argument 3) and contention that the ALJ erroneously gave significant weight to "outdated" non-examining records (Argument 4) will also be considered together.

### A.  Substantial Evidence (Arguments 1, 2, 5)

Plaintiff argues that the credibility determination and conclusions regarding the opinion evidence were supported by misstatements and distortions of the record. *Plaintiff's Brief* at 9-11.

First, Plaintiff argues that his father's assessment of the daily activities were misstated by the ALJ. *Id.* at 9.  Plaintiff faults the ALJ for failing to mention that the father stated that Plaintiff took one or more hours to dress, one or more hours to bathe, 30 minutes to prepare small meals, and demonstrated general slowness and need for reminders in performing household chores. *Id.*

As to the assessment by Plaintiff's father, the ALJ found as follows:

[F]ather stated in his third-party function report that due to [OCD], it took the claimant a long time to dress, bathe, prepare food, and do housework. However the report indicates that [Plaintiff] was still able to engage in these activities.  It was noted that the claimant was able to drive, but was afraid to do so (Tr. 17).

Contrary to Plaintiff's assertion, the ALJ provided an accurate summation of the father's account.  The ALJ correctly noted the father's report that Plaintiff spent an unusually long time in self care activities.   The fact that the ALJ referred to it as a "long time" and the father stated "one or more hours" (Tr. 373) does not amount to a misreading or distortion of the record.

-17-

Second, Plaintiff claims that he cannot locate record support for the administrative finding that he attended family functions, enjoyed playing with his niece, went out to eat, and socialized with an old friend (Tr. 23).   However, all of these findings by the ALJ are confirmed by my own review of the records: Plaintiff enjoyed himself at a family function (Tr. 656), enjoyed playing with niece (Tr. 646), went out to eat (684), and socialized with a childhood friend and friend's girlfriend (Tr. 862).  Further, while Plaintiff refers to the record evidence supporting the ALJ's findings as "snippets," the records as a whole support the finding that Plaintiff was capable of at least unskilled work.  Counseling records from July, 2012 to March, 2013 undermine Plaintiff's allegations that he was psychologically incapable of work as found in the RFC.[3]  In June, 2012, he denied recent panic attacks (Tr. 580).  In July, 2012, the counselor noted that Plaintiff had applied for SSI but that "it [was] not clear how he was disabled" (Tr. 596).  Counseling records from the following month state that Plaintiff was urged to apply to trade school and that "finding a job" was a significant part of his therapy (Tr. 597-598).  Despite repeated recommendations to obtain a job or apply for trade school, the records show that Plaintiff was largely preoccupied with obtaining SSI and contemplated "under the table" employment so as not to prevent an award of benefits (Tr. 658).

---

[3]Patrick Reid's counseling records are discussed more fully in Section II.C.1., *above.*

Third, Plaintiff's argument that the ALJ did not consider the records predating Dr. Stelson's January, 2014 assessment does not provide grounds for remand. Plaintiff cites Dr. Stelson's June, 2013 report to the State of Michigan noting marked limitations in the ability to complete a normal workday without psychologically based interruptions (Tr. 634). However, the ALJ acknowledged the report, but reasonably concluded that Dr. Stelson's finding of disability limitation was contradicted by the treating and counseling records of the previous 12 months showing improvement in "July, October, and December, 2012" (Tr. 24). The ALJ noted further that most of the records "revolved around [Plaintiff's] complaints about his dependence on his parents and his father's failure to fix his car, rather than any [psychological] symptoms" (Tr. 24).

Plaintiff also disputes the ALJ's partial rejection of Dr. Stelson's July, 2015 opinion. *Id.* at 10 (*citing* Tr. 25, 853-854). He faults the ALJ's accord of "limited weight" to the opinion on the basis that Dr. Stelson's finding of "frequent decompensations" was not supported by the record (Tr. 25). Plaintiff notes that the word decompensation was not found in Dr. Stelson's July, 2015 opinion. *Id.* However, the ALJ's mention of "frequent decompensations," is a shorthand reference to Dr. Stelson's finding of "periods of each day in which [Plaintiff] is totally disabled by his anxiety symptoms" and finding that mounting anxiety would periodically "precipitate either an anxiety attack or an anger reaction . . . ." (Tr. 853). The ALJ's reference to the alleged episodes as periods of "decompensation" is not an inaccurate summary of Dr. Stelson's opinion. While Plaintiff argues further that the

-19-

record actually supports the finding that he experienced "frequent decompensations" *id.,* the ALJ correctly noted that the 2014 and 2015 records reflected "improvement with medication," and that many of the reported symptoms were attributable to "weaning off Suboxone" (Tr. 25). My own review of the later treating records shows that Plaintiff was doing "okay" (Tr. 881), had better sleeping habits (Tr. 882), and, after an April, 2015 bout of renewed depression, was doing "okay" and "alright" in May and June, 2015 respectively (Tr. 885-887). The ALJ did not err in concluding that Dr. Stelson's records reflected an improvement in Plaintiff's condition in 2014 and 2015.

Finally, Plaintiff argues that the ALJ "glossed over" Kenna's June, 2015 consultative finding that Plaintiff "doesn't appear able to do work related activity in a sustainable length of time." *Id.* at 12-13 (*citing* Tr. 25-26, 848). However, the ALJ's discussion of Kenna's findings and the reasons for their partial rejection is anything but superficial. The ALJ acknowledged Kenna's "sustainable length of time" finding, but noted that Plaintiff's claim that the condition of OCD prevented the timely completion of tasks was supported chiefly by Plaintiff's own allegations:

> In regards to the claimant's OCD symptoms, there is little mention elsewhere of the need to do things perfectly. His main symptom in this area appears to be frequent hand washing. The claimant's performance at the exam does not indicate significant memory or concentration problems of cognitive issues, but his deficits in the area are accounted for in the limitations of the [RFC] (Tr. 26).

The ALJ adopted Kenna's finding that Plaintiff did not experience any limitation in the ability to understand, remember, and carry out simple instructions (Tr. 26).

Because the ALJ's credibility determination and discussion of the treating and consultive records is well supported and explained, a remand on this basis is not warranted.

## B. A "Closed Period" and the ALJ's Reliance on the Non-Examining Evidence (Arguments 3 and 4)

Plaintiff is correct that an ALJ is required to consider whether a claimant is disabled for any 12-month or longer period within the time frame under consideration. "In determining whether [a claimant] is entitled to disability benefits, it is also necessary to consider every [12-month] period during which Plaintiff may have been disabled" *Pena v. Barnhart*, 2002 WL 31487903, *11 (S.D.N.Y. October 29, 2002); 42 U.S.C. §§ 1382c(a)(3)(A), 423(d)(1)(A). "'[I]n a closed period case, the [ALJ] determines that a new applicant for disability benefits was disabled for a finite period of time which started and stopped prior to the date of his decision ....'" *Lozada-Rivera v. CSS*, 2015 WL 400908, at *3 (E.D.Mich. January 28, 2015)(Tarnow, J.)(*citing Campbell* v. CSS, 2011 WL 2160460, at *4 n. 4 (E. D. Mich. June 1, 2011))(Duggan, J.)(*citing Waters v. Barnhart*, 276 F.3d 716, 719 (5th Cir.2002)).

However, Plaintiff's contention that he is entitled, at a minimum, to benefits for a closed period, *Plaintiff's Brief* at 4, is undeveloped in his subsequent arguments for remand.[4] *See Id.* at 10. Plaintiff appears to argue that the ALJ erred by failing to whether he was

_____

[4]Plaintiff states only that "If [he] was not disabled in January, 2014, the ALJ still does not speak of his condition before that date, 19 months after the application was filed . . . ." *Plaintiff's Brief* at 10.

disabled between the alleged June, 2012 onset date and Dr. Stelson's January, 2014 finding of significant improvement (Tr. 829).  However, as discussed above, the ALJ provided a thorough and accurate summation of the records created between June, 2012 and January, 2014, citing the records from October, 2012 of fewer panic attacks (Tr. 23), December, 2012 plans to get an "under the table" job (Tr. 23), and the ability to play video games, socialize, and go out to eat as of March, 2013 (Tr. 23-24).  And while Plaintiff also argues that the ALJ erred by adopting Dr. Moten's "outdated" November, 2012 non-examining findings, see *below,* these findings constitute substantial evidence supporting the conclusion that Plaintiff was not disabled for any 12-month period before January, 2014.  Because Plaintiff has not met the "burden of demonstrating disability lasting at least twelve months," for anytime between June, 2012 and January, 2014, he is not entitled to a closed period of benefits. *Thomas v.CSS*, 2017 WL 127509, at \*6 (W.D.Mich. January 13, 2017).

For differing reasons, Plaintiff's argument that the ALJ erred by relying Dr. Moten's November, 2012 non-examining findings instead of Dr. Stelson's more recent treating opinion does not provide grounds for remand.  *Plaintiff's Brief* at 12-13.  Plaintiff is correct that as a rule "updated" medical records are to be accorded more weight than older ones. *See Brooks v. CSS*, 531 Fed.Appx. 636, 642 (6th Cir. August 6, 2013)(ALJ adoption of non-consulting source's earlier opinion over the more recent examining findings constitutes reversible error).

-22-

However, *Brooks* does not state that the adoption of the older records automatically constitutes error.  Rather, in the instance that "an ALJ relies on a non-examining source who 'did not have the opportunity to review' later submitted medical evidence, especially when that evidence 'reflects ongoing treatment,'" the reviewing court "generally require[s] 'some indication that the ALJ at least considered these new facts before giving greater weight to an opinion that is not based on a review of a complete case record.'" *Brooks*, 531 Fed.Appx. at 642 (*citing Blakley v. CSS,* 581 F.3d 399, 409 (6th Cir. 2009))(internal citations and punctuation omitted).

The administrative decision contains a thorough discussion of the records post-dating Dr. Moten's November, 2012 findings (Tr. 23-25).  The ALJ noted that the counseling records from December, 2012 to March 2013 strongly undermined the disability claims (Tr. 23).  The ALJ discussed Dr. Stelson's treating records and opinions postdating the non-examining findings (Tr. 23-25).  He discussed Kenna's June, 2015 consultative findings and provided adequate reasons for accepting some of her findings and rejecting others (Tr. 25-26).  Because the record shows that the ALJ considered and discussed the "new facts" at length before adopting Dr. Moten's findings, the significant weight accorded the older, non-examining source does not provide grounds for remand.[5]

---

[5]

Plaintiff's argument on this point is particularly weak, given that he concedes elsewhere in his brief, see *above,* that his condition improved as of January, 2014.  If that is so, then Dr. Moten's November, 2012 findings would be expected to overstate, rather than understate the severity of his condition as of the November 19, 2015 determination.

-23-

In conclusion, because the ALJ's decision was well articulated and within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

Accordingly, I recommend that Defendant's Motion for Summary Judgment [Docket #14] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #11] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: January 16, 2018                          s/R. Steven Whalen
                                                 R. STEVEN WHALEN
                                                 U.S. MAGISTRATE JUDGE

---

## CERTIFICATE OF SERVICE

I hereby certify on January 16, 2018 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF participants on January 16, 2018.

                                                 s/Carolyn M. Ciesla
                                                 Case Manager for the
                                                 Honorable R. Steven Whalen

-25-